UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

RICHARD JACKSON,

     Plaintiff,

v.                                   Case No.: 4:14-cv-548

FLORIDA DEPARTMENT OF CORRECTIONS,
MARSHA NICHOLS, WILLIAM RUMMEL,
ANDREW LOCKLEAR, AND DOES 1-8,

     Defendants.

_____/

## COMPLAINT

Plaintiff Richard Jackson sues Defendants Florida Department of Corrections ("FDOC"), William Rummel, Marsha Nichols, Andrew Locklear, and Does 1-8 and alleges as follows:

## Preliminary Statement

1.    Richard Jackson has paraparesis—partial paralysis of the lower limbs. He acquired this disability more than 25 years ago. Because of his disability, he cannot walk on his own and must use a wheelchair for mobility. Prison officials generally permit Jackson to use a wheelchair both inside his cell and to move about the prison. However, prison officials at Santa Rosa Correctional Institution ("Santa Rosa CI") refused to allow Jackson to have and use a wheelchair inside his cell. As a result, to navigate within the cell—between his bed, toilet, cell door

food hatch, and wash basin—and to enter and exit the cell, Jackson had to crawl using his hands and arms, dragging his body on the filthy prison floor.  He has suffered physical injuries and continues to be at risk of suffering more severe injuries, if he is again transferred to Santa Rosa CI.  He has also suffered the humiliation of having to endure inhumane and undignified treatment at the hand of Santa Rosa CI prison officials.  When he sought relief from this Court by filing a lawsuit in 2013, the FDOC transferred him to another prison where he was retaliated against for seeking redress from the Court.

## Jurisdiction and Venue

2.     Plaintiff brings this action pursuant to (a) 42 U.S.C. § 1983 for violations of civil rights under the Eighth and Fourteenth Amendments to the United States Constitution; (b) Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq*., (hereinafter the "ADA"); and (c) Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (hereinafter the "Rehabilitation Act").

3.     This Court has subject-matter jurisdiction over this matter under the following: (a) 28 U.S.C. § 1331 (federal question) and (b) 28 U.S.C. § 1343 (civil rights).

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c) because one or more Defendant resides in this judicial district and the events or omissions giving rise to the claims occurred in this judicial district.

## Parties

5.      Plaintiff Richard A. Jackson (Fla. DOC No. 064565) was born in 1958 and has had paraparesis since 1985.  He is, and was at all material times, an inmate in the custody and under the control of the FDOC and accordingly subject to the policies, practices, and customs of the FDOC.

6.      Defendant Florida Department of Corrections (FDOC) is a public entity for purposes of Title II of the ADA and is a recipient of federal funding for purposes of the Rehabilitation Act.

7.      Defendant Marsha Nichols is, and was at all material times, an advanced registered nurse practitioner (ARNP) and employed by Defendant FDOC at Santa Rosa CI.  She had responsibility to designate whether durable medical equipment, including a wheelchair, is necessary for an inmate.  She is sued in her individual capacity.

8.      Defendant William Rummel, is a physician who is employed by Defendant FDOC and oversees Nichols and approves her medical decisions,

including the necessity of a wheelchair for inmates, at Santa Rosa CI, and was at all relevant times.  He is sued in his individual capacity.

9.     Defendant Locklear is, and was at all material times, a corrections officer at Northwest Florida Reception Center (NWFRC) and employed by Defendant FDOC.  He is sued in his individual capacity.

10.     Unknown Defendant Does 1-8 are corrections officers at NWFRC prison and employed by Defendant FDOC, and were at all relevant times.

11.     Prison officials, including all individually named Defendants, are employees of FDOC; they are under the control and supervision of FDOC; they act as its agents.

12.     Each Defendant at all times relevant hereto was acting and continues to act under color of law.

## Factual Allegations

### *Jackson's Paraparesis & Needed Wheelchair*

13.     Plaintiff Richard Jackson has paraparesis—partial paralysis of the lower limbs.  He has had paraparesis since 1985.

14.     As a result of his paraparesis, Jackson cannot walk on his own.   He requires a wheelchair to safely and independently move from place to place.

15.     Paraparesis is a disability for purposes of the ADA, 42 U.S.C. § 12101 *et seq.*. and the Rehabilitation Act, 29 U.S.C. § 794.

16.     Jackson's physical impairments of paraparesis substantially limits one or more of his major life activities, including but not limited to, walking, caring for himself, standing, performing manual tasks, working, and using the bathroom.

17.     Jackson meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the FDOC. These programs, services, or activities include but are not limited to safe and effective housing, meals, recreation, sanitation, and medical care.

18.     In 1993, Jackson was remanded to prison.  Since this time, FDOC has had custody and control of Jackson.  When he was first remanded to prison, Jackson already had paraparesis and required a wheelchair for safe mobility.

19.     To accommodate Jackson's disability, at times the FDOC either provided Jackson with a standard issue wheelchair or allowed him to use his own, which he brought to prison. All of the parts on the FDOC standard issue

wheelchair are welded to the frame of the wheelchair and were at all relevant times, so none of the parts can be removed.

20.    The FDOC houses some disabled inmates in cells that are slightly larger than a typical single-person cell.  The toilet basin and bed are set at a similar height as a wheelchair to allow for easy transfer to and from the wheelchair.  The wash basin is set high enough and with sufficient under-clearance so that an inmate can roll his wheelchair under the wash basin to wash his hands and otherwise use the sink.  The bed is approximately six feet from the toilet, free-standing wash basin, and the cell door.

21.    Since 1993, the FDOC has housed Jackson in various prisons.  In all these prisons, prison officials have permitted Jackson to use a wheelchair to move throughout the prison compound.  Additionally, in all these prisons but Santa Rosa CI, prison officials have permitted Jackson to use a wheelchair to move within his cell or housing unit.

*Santa Rosa CI Refused Use of Wheelchair in Cell*

22.     FDOC detained Jackson at Santa Rosa CI from October 4, 2012, through December 9, 2013.  During this entire time, FDOC confined him in Close Management (CM).

23.     CM involves more stringent security requirements and restrictions. By FDOC policy, determinations of an inmate's medical needs are informed by these more stringent security requirements and restrictions.  FDOC permits medical personnel to disallow medical accommodations for a CM inmate that would otherwise be deemed necessary and allowed for an inmate not confined in CM.

24.     This policy was applied to Jackson.  Although prison officials deemed a wheelchair necessary and permitted Jackson to have and use one at other facilities and at Santa Rosa CI outside his cell, FDOC's policy permitted Santa Rosa CI prison officials to withhold from Jackson a wheelchair while he was inside his CM cell.

25.     From October 4, 2012, through December 9, 2013, Santa Rosa CI prison officials permitted other inmates detained in the same CM wing as Jackson to have and used a wheelchair inside their cells.

26.     In CM, Jackson was confined alone to a cell for 24 hours per day, 7 days per week, except that he was permitted to leave his cell for only up to one hour three times per week.

27.     From October 4, 2012, through December 9, 2013, Santa Rosa CI prison officials detained Jackson in a single-occupancy cell without a cellmate. They housed him a cell was designed for wheelchair use.  However, Santa Rosa CI prison officials intentionally refused to allow Jackson to have a wheelchair inside his cell.

28.     Before October 4, 2012, Jackson had told Santa Rosa CI prison officials, including Nichols, he had paraparesis and had requested to use a wheelchair both inside his cell and throughout the prison.  Consequently, Santa Rosa CI prison officials allowed him to use a wheelchair throughout the prison, but not inside his cell.

29.     Nichols intentionally refused to grant Jackson a medical pass to have a wheelchair inside his cell.

30.     Nichols conferred with Rummel about her determination and refusal to grant Jackson a medical pass to have a wheelchair inside his cell.  Rummel approved Nichols's determination and refusal.

31.     Acting on the advice of Nichols and Rummel, prison official intentionally refused to allow Jackson to have a wheelchair inside his cell.

32.     Because Jackson could not use a wheelchair inside his cell, he was adversely affected in several ways, including but not limited to the following:

(a)     It hindered his safe entrance and exit from the cell.  Prison officials would roll him to the cell door and then dump him out of the wheelchair onto the floor or allow him to dump himself.  He would then crawl into the cell using his hands and arms, dragging his legs behind him.  Similarly, to exit the cell, he would crawl on the floor to the outside of the cell and then, using his hands and forearms, hoist himself onto his chair.

(b)     It hindered his safe movement within the cell.  Because the wheelchair, toilet, and bed are a similar height from the floor, an inmate can

usually transfer from the bed to the wheelchair and to the toilet without significant trouble.  The toilet, free-standing wash basin, door, and bed are distanced from each other (approx. six feet) to allow for greater access with a wheelchair. However, without the wheelchair, Jackson would lower himself from the bed, crawl several feet along the floor, and then pull himself up using his forearms onto the toilet basin.  To obtain the food tray delivered to his cell, without the wheelchair Jackson would lower himself from the bed, crawl several feet along the floor and retrieve it from the flap in the cell door.

(c)     It made the wash basin inaccessible.  Because the wash basin sits sufficiently above the floor to allow a wheelchair to roll underneath it, if the inmate does not have the wheelchair and cannot otherwise stand, the wash basin is too high to be used.

33.     Prison cell floors were and are abrasive and dirty.  Santa Rosa CI prison officials would come by weekly with a mop to allow inmates in CM to mop their own cells.  However, an inmate would have to request the use of the mop by standing at his cell door.  Because Jackson could not stand (at the door or otherwise), Santa Rosa CI prison officials did not offer the mop to Jackson.  While

he was at Santa Rosa CI in 2012 and 2013, Jackson's cell floor was rarely, if ever, cleaned.

34.     Because Defendants refused to allow Jackson to use his wheelchair inside his cell for safe mobility, Jackson has suffered, and would suffer the same in the future from, serious physical injuries resulting in pain and mental anguish. Those injuries include, but are not limited to, the following:

(a)     Jackson's shoulders were dislocated from the jolts of moving (or being dumped) from the wheelchair, bed, and toilet to the floor.  The shoulder dislocation has caused gaps in his shoulder joints, which can lead to nerve damage.

(b)     Jackson had abrasions and open sores on his legs and feet because his skin was torn off from dragging himself along the filthy, abrasive cell floor.  These sores were consistently becoming infected.  Because of the dislocation of his shoulder joints, many times Jackson's shoulders would give out as he was dragging himself along the floor, causing Jackson to hit his face and head on the floor, causing lacerations and pain.

35.     Additionally, because Defendants refused to allow Jackson to use his wheelchair inside his cell and had to strenuously exert himself by crawling,

hoisting, and lessening the impact from the falls from the bed, toilet, and wheelchair, Jackson blood pressure might have increase to dangerously high levels.

36.     Prison officials, including Nichols and Rummel, knew Jackson did not have his wheelchair in his cell.

37.     Prison officials, including Nichols and Rummel, knew that because Jackson did not have a wheelchair in his cell, he moved in, out, and around his cell by propelling himself with his arms and dragging his torso and legs behind.

38.     Prison officials, including Nichols and Rummel, knew that moving in, out, and around his cell in this fashion caused Jackson serious medical problems, including physical injuries described above.

39.     Prison officials, including Nichols and Rummel, knew of the substantial risk of further injury and blood pressure spikes from the inability to have his wheelchair in his cell.

40.     On numerous occasions between October 4, 2012, and December 9, 2013, Jackson complained to prison officials, including Nichols and Rummel, that he was not allowed to have a wheelchair inside his cell and requested he be

allowed to use one.  He alerted prison officials, including Nichols and Rummel, that not having a wheelchair in his cell was causing Jackson serious physical injuries.

41.     Yet, they disregarded the injuries and risks by failing and intentionally refusing to do anything that would remedy the situation, in violation of clearly established law. They were deliberately indifferent to Jackson's serious medical needs, injuries, and continued risk of serious harm to Jackson.

42.     Plaintiff has exhausted all available administrative remedies.  Jackson filed *pro se* a similar lawsuit in April 2013.  *Jackson v. Crews* et al., No. 3:13-cv-174 MCR-CJK (N.D. Fla.).  The Court dismissed this lawsuit in October 2014 for failure to exhaust administrative remedies.  However, during May - July 2014, Jackson exhausted all available administrative remedies related to the claims in this current lawsuit.

43.     There is no legitimate reason, medical, penological, or otherwise, for denying Jackson the use of a wheelchair in his cell.

44.     Jackson is not currently housed at Santa Rosa CI, Jackson. However, the FDOC will detain Jackson for another five years; Jackson's current release date

is in December 2019.  Since 1993, Jackson has been transferred to Santa Rosa CI over twenty times.  Santa Rosa CI is one of a limited number of state prisons which the FDOC believes is appropriate to house Jackson.  If the FDOC transfers Jackson to Santa Rosa CI, the prison's practice, policy and procedures would allow officials to again consider Jackson's use of a wheelchair inside his cell unnecessary and deny him the use of a wheelchair inside his cell.  Thus, unless enjoined by this Court, Jackson would likely be withheld his wheelchair at Santa Rosa CI, if he were to be transferred there.

### Defendants at NWFRC Retaliated Against Jackson

45.    On or about December 9, 2013, Jackson was transferred to Northwest Florida Reception Center ("NWFRC"), in Chipley, Florida.

46.    Since Jackson filed *Jackson v. Crews* et al., No. 3:13-cv-174, James White, who oversaw security at Santa Rosa CI and was a defendant in that lawsuit, had also been transferred to NWFRC to become its Assistant Warden.  White supervised Locklear.

47.    Within four to five hours of Jackson arriving at NWFRC, Andrew Locklear approached Jackson, handcuffed Jackson to his wheelchair, and told

Jackson that his friends from Santa Rosa CI had told Locklear to show Jackson

what happens when inmates file lawsuits against staff and what would keep

happening unless Jackson drops the lawsuit, *Jackson v. Crews*, No. 3:13-cv-174.

Officer Locklear then physically assaulted Jackson by punching him in the face

and head with his fists and kicking Jackson's legs.  Officer Locklear told Jackson

that he would be getting more if he did not drop the lawsuit.

48.    As a result of this beating, Jackson suffered physical injuries

(including lacerations and bruising), pain, mental pain and anguish.

49.    Upon information and belief, Locklear assaulted Jackson to retaliate

and deter Jackson from continuing that lawsuit asserting his rights under the Eighth

Amendment, ADA, and Rehabilitation Act.

50.    After the assault, Jackson was placed in CM confinement at NWFRC,

where he was permitted to have his wheelchair in his cell.  Starting the next

morning, confinement staff came to Jackson's cell door with the food trays, held

them out of reach and said, "If you want to eat, drop the lawsuit."  Some officers

would simply throw Jackson's food on the floor.  Approximately eight unknown

corrections officers at NWFRC (Defendants Doe 1-8) withheld food from Jackson

in retaliation for Jackson filing this lawsuit.  They withheld meals—up to three per

day—for approximately one month.  Upon information and belief, this was done to retaliate for the lawsuit.

51.     Jackson lost approximately thirty (30) pounds of body weight between December 9, 2013, and mid-January 2014.

52.     Upon information and belief, to cover up the withholding of food, NWFRC prison officials falsely recorded in the confinement log book that Jackson was on a hunger strike and refusing his meals.

53.     Fearing for his life and to be able to get something to eat, Jackson decided to go along with staff's false allegations and informed the medical staff that he was on a hunger strike, and the medical staff had Jackson moved to the medical department.

54.     In the medical department, just as Jackson was getting ready to eat his first meal in several weeks, Sergeant Baker came to Jackson and stated that if Jackson ate any food while in medical, he would die a slow death from poison. Several inmate orderlies who work in the medical department have informed Jackson to be careful because staff was tampering with Jackson's food.

55.     Locklear and Does 1-8 knew Jackson was not being fed properly and knew of the resulting substantial risk of serious harm.  Yet, they disregarded the risks by failing and intentionally refusing to do anything that would remedy the situation, in violation of clearly established law. They were deliberately indifferent to the continued risk of serious harm to Jackson.

**Count 1:**
**Eighth Amendment**
**against Defendants Rummel, Nichols,**
**Locklear, and Does 1-8**

56.     Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

57.     This count is against Nichols, Rummel, Locklear, and Does 1-8 (collectively "the Individual Defendants") for the violation of the Eighth Amendment to the U.S. Constitution.  Plaintiff's claim for relief on this Count is predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Eighth and Fourteenth Amendments to the U.S. Constitution and the laws of the United States.

58.     The Individual Defendants acted maliciously, sadistically, and without any legitimate or penological justification, when they refused to allow Plaintiff to have his wheelchair in his cell, assaulted the Plaintiff, and/or withheld food from him.

59.     Refusing a person the necessary use of a wheelchair and thereby forcing a person to be dumped in front of his cell and crawl in and out of it and along the cell floor inside is repugnant to the conscience of mankind.  Similarly, prison officials' use of excessive force, withholding food, or both in retaliation for asserting an ADA claim is repugnant to the conscience of mankind.

60.     The Individual Defendants' actions deprived Plaintiff of humane conditions of confinement and exposed Plaintiff to grave conditions that violated contemporary standards of decency, resulting in the denial of civilized life's minimal necessities.

61.     The Individual Defendants' actions and omissions directly and proximately caused Plaintiff to suffer serious physical injuries, mental pain and anguish, pain, and humiliation, among other things.

62.     The Individual Defendants knew that refusing to allow Plaintiff to have his wheelchair in his cell presented a substantial risk of serious harm to Plaintiff, and indeed was causing Plaintiff serious harm.  Yet, the Individual Defendants disregarded that risk by failing and intentionally refusing to do anything that would remedy the situation, in violation of clearly established law. The Individual Defendants were deliberately indifferent to the risk of serious harm to Plaintiff.

63.     The Individual Defendants knew that Plaintiff suffered from a serious medical need, yet failed and intentionally refused to provide the necessary aid and treatment that would have easily remedied it, in violation of clearly established law.  The Individual Defendants were deliberately indifferent to Plaintiff's serious medical need.

## Count 2:
## Americans with Disabilities Act
## against Defendant FDOC

64.     Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

65.     This count is a claim for disability discrimination against Defendant FDOC for violating Title II (public entities) of the ADA.

66.    Defendant FDOC is an agency of the state of Florida, and is therefore a "public entity" as defined in 42 U.S.C. § 12131.

67.    Plaintiff is and was at all material times a qualified individual with a disability.

68.    Through the operation of its prison, Santa Rosa CI, FDOC provides various "services, programs, and activities," including safe and effective housing, meals, recreation, sanitation, and medical care, as these terms are used in 42 U.S.C. § 12132.

69.    Defendant FDOC excluded Plaintiff from participation in and denied Plaintiff the benefits of these programs, services, and activities.

70.    Defendant FDOC limited Plaintiff's enjoyment of rights, privileges, advantages, and opportunities enjoyed by others receiving an aid, benefit, or service of the FDOC.

71.    Defendant FDOC subjected Plaintiff to discrimination based on his disability.

72.    Defendant FDOC failed to provide a reasonable accommodation for Plaintiff's disability.

73.     Defendant FDOC, its employees, and agents knew and/or should have known of Plaintiff's need for a reasonable accommodation. Plaintiff's need for a reasonable accommodation was known and obvious.

74.     Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the ADA violations alleged herein. Defendant FDOC's agents and employees accepted the undertaking of acting on behalf of defendant FDOC when they committed the ADA violations alleged herein.  Defendant FDOC had control over its agents and employees when they committed the ADA violations alleged herein.

75.     The ADA violations alleged herein and committed by Defendant FDOC's agents and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDOC.  Thus, Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the ADA violations alleged herein.

76.     Defendant FDOC, its agents and employees, acted intentionally and/or with deliberate indifference to Plaintiff's rights under the ADA.

77.     Defendant FDOC's actions and omissions, and those of its agents and employees, also violated the Eighth and Fourteenth Amendments to the U.S. Constitution.

78.     As a direct and proximate result of defendant FDOC's, its employees', and agents' actions and omissions, Plaintiff suffered serious physical injuries, mental pain and anguish, pain, and humiliation, among other things.

## Count 3:
## Section 504 of the Rehabilitation Act
## against Defendant FDOC

79.     Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

80.     This count is a claim for disability discrimination against Defendant FDOC for the violation of the Rehabilitation Act, 29 U.S.C. § 794.

81.     As used in 29 U.S.C. § 794, Defendant FDOC "receives," and at all material times received, federal financial assistance for a program or activity.

82.     Plaintiff is and was at all relevant times a qualified individual with a disability.

83.     Defendant FDOC excluded Plaintiff from the participation in and denied Plaintiff the benefits of the programs, services, and activities of the FDOC, solely by reason of his disability.

84.     Defendant FDOC subjected Plaintiff to discrimination solely by reason of his disability.

85.     Defendant FDOC failed to make a reasonable accommodation to Plaintiff.  *See* 28 C.F.R. § 41.53.

86.     Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the Rehabilitation Act violations alleged herein.  Defendant FDOC's agents and employees accepted the undertaking of acting on behalf of defendant FDOC when they committed the Rehabilitation Act violations alleged herein.  Defendant FDOC had control over its agents and employees when they committed the Rehabilitation Act violations alleged herein.

87.     The Rehabilitation Act violations alleged herein and committed by Defendant FDOC's agents and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDOC.  Thus,

Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the Rehabilitation Act violations alleged herein.

88.    Defendant FDOC, its agents and employees, acted intentionally and/or with deliberate indifference to Plaintiff's rights under the Rehabilitation Act.

89.    As a direct and proximate result of defendant FDOC's, its employees', and agents' actions and omissions, Plaintiff suffered serious physical injuries, mental pain and anguish, pain, and humiliation, among other things.

## Count 4:
## Americans with Disabilities Act – Retaliation and Interference against Defendant FDOC

90.    Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

91.    This count is brought against Defendants FDOC pursuant to the retaliation and interference provisions of the ADA, 42 U.S.C. § 12203.

92.    Defendant FDOC discriminated against Plaintiff because Plaintiff opposed the withholding of his wheelchair inside his cell, which is unlawful under the ADA, and because Plaintiff filed this lawsuit, *Jackson v. Crews* et al., No. 3:13-cv-174, complaining of the ADA violations described herein.

93.     Defendant FDOC coerced, intimidated, threatened, and/or interfered with Plaintiff's exercise or enjoyment of, and on account Plaintiff having exercised or enjoyed his rights granted or protected by the ADA.

94.     Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the ADA violations alleged herein. Defendant FDOC's agents and employees accepted the undertaking of acting on behalf of defendant FDOC when they committed the ADA violations alleged herein.  Defendant FDOC had control over its agents and employees when they committed the ADA violations alleged herein.

95.     The ADA violations alleged herein and committed by Defendant FDOC's agents and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDOC.  Thus, Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the ADA violations alleged herein.

96.     Defendant FDOC, its agents and employees, acted intentionally and/or with deliberate indifference to Plaintiff's rights under the ADA.

97.    Defendant FDOC's actions and omissions, and those of its agents and employees, also violated the First, Eighth, and Fourteenth Amendments to the U.S. Constitution.

98.    As a direct and proximate result of defendant FDOC's, its employees', and agents' actions and omissions, Plaintiff suffered serious physical injuries, mental pain and anguish, pain, and humiliation, among other things.

## Jury Demand

Plaintiff demands trial by jury on all issues that can be heard by a jury.

## Request for Relief

WHEREFORE, Plaintiff requests the following relief:

A.    A declaration that the Defendants' actions and omissions have violated Plaintiff's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution, the ADA, and the Rehabilitation Act;

B.    A declaration that FDOC's policy permitting a prison officials to withhold a medically necessary wheelchair from an inmate inside his cell violates, as applied to Jackson, the Eighth and Fourteenth Amendments to the U.S. Constitution, the ADA, and the Rehabilitation Act;

C.     An order directing the entry of judgment for the Plaintiff against the each Defendants for nominal and compensatory damages to compensate Plaintiff for, among other things, physical injuries, pain, mental pain and suffering, humiliation, embarrassment, and violation of his disability-related rights;

D.     An award of punitive damages against the Individual Defendants;

E.     A permanent injunction requiring FDOC to permit Plaintiff to use his wheelchair in his cell;

F.     An award of attorneys' fees, costs, and litigation expenses under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a;

G.     An order prohibiting Defendants and their agents from retaliating against Plaintiff; and

H.     Such other and further relief as may be just and equitable.

**Respectfully Submitted,** October 16, 2014

s/Benjamin James Stevenson
**Benjamin James Stevenson**
Fla. Bar. No. 598909
ACLU Found. of Fla.
P.O. Box 12723
Pensacola, FL  32591-2723
T. 786.363.2738
BStevenson@aclufl.org

**Dante P. Trevisani**
Fla. Bar No. 72912
DTrevisani@FloridaJusticeInstitute.org
**Randall C. Berg, Jr.**
Fla. Bar No. 318371
RBerg@FloridaJusticeInstitute.org
Florida Justice Institute, Inc.
100 SE Second St., Ste. 3750
Miami, FL 33131-2115
T. 305.358.2081
F. 305.358.0910

**Nancy Abudu***
Fla. Bar. No. 111881
ACLU Found. of Fla.
4500 Biscayne Blvd., Ste. 340
Miami, FL 33137
T. 786.363.2700
NAbudu@aclufl.org

*Admission to N.D. Fla. forthcoming*

*Counsel for Plaintiff*